IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

QUINTIN TRAVEY JONES,

    Defendant.

CRIMINAL ACTION FILE NO.:

1:23-CR-52-SEG-JKL

## FINAL REPORT AND RECOMMENDATION

This criminal case is before the Court on Defendant Quinton Travey Jones's Motion to Dismiss Indictment.  [Doc. 12.]  For the reasons that follow, it is **RECOMMENDED** that the motion be **DENIED**.

## I.    BACKGROUND

Defendant is charged in this case with one count of knowingly possessing a firearm while having previously been convicted of two misdemeanor crimes of domestic violence in violation of 18 U.S.C. § 922(g)(9), which prohibits a person "who has been convicted in any court of a misdemeanor crime of domestic violence" from possessing a firearm.  [Doc. 1.]  Defendant moves to dismiss the indictment on the grounds that § 922(g)(9) is unconstitutional, as applied to him, under *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).  [Doc. 12.]  The

government has filed a response [Doc. 32], and Defendant a reply [Doc. 34[1]].  The

motion is now ripe for consideration.

## II.     DISCUSSION

### A.     Relevant Authority

The Second Amendment provides that "[a] well regulated Militia, being

necessary to the security of a free State, the right of the people to keep and bear

Arms, shall not be infringed."  U.S. Const. amend. II.  In *District of Columbia v.*

*Heller*, 554 U.S. 570 (2008), the Supreme Court "interpreted this language to

'guarantee an individual right to possess and carry weapons in case of

confrontation.'"  *United States v. White*, 593 F.3d 1199, 1205 (11th Cir. 2010)

(quoting *Heller*, 554 U.S. at 592).  As relevant here, the Supreme Court went on to

explain in dictum that an individual's right to bear arms was not unlimited and that

"nothing in [the] opinion should be taken to cast doubt on longstanding prohibitions

on the possession of firearms by felons and the mentally ill, or laws forbidding the

carrying of firearms in sensitive places such as schools and government buildings,

or laws imposing conditions and qualifications on the commercial sale of arms."

---

[1] Defendant also filed an amended reply to correct a formatting problem. [Doc. 35.]  The amended reply is substantially the same as the initial reply, so the Court simply cites to the initially-filed reply in this report and recommendation.

*Heller*, 554 U.S. at 626-27; *see also White*, 593 F.3d at 1205 (describing this qualification as dictum).

Roughly two years later, the Eleventh Circuit applied *Heller* to conclude that § 922(g)(9) did not violate the Second Amendment because it "is a presumptively lawful longstanding prohibition on the possession of firearms." *White*, 593 F.3d at 1206 (cleaned up). The court reasoned that Congress enacted § 922(g)(9) in 1996 to include domestic abuse misdemeanants because existing laws prohibiting felons from possessing firearms did not go far enough. As the court put it,

> By way of example, the federal ban on felons-in-possession in § 922(g)(1)—a statute characterized in the *Heller* dictum as a presumptively lawful longstanding prohibition—does not distinguish between the violent and non-violent offender. Thus, both an armed robber and tax evader lose their right to bear arms on conviction under § 922(g)(1). In contrast, a person convicted under § 922(g)(9) must have first acted violently toward a family member or domestic partner, a predicate demonstrated by his conviction for a misdemeanor crime of violence. Thus, although passed relatively recently, § 922(g)(9) addresses the thorny problem of domestic violence, a problem Congress recognized was not remedied by "longstanding" felon-in-possession laws. We see no reason to exclude § 922(g)(9) from the list of longstanding prohibitions on which *Heller* does not cast doubt.

*Id.* at 1205-06.

In the years after *White* was decided, some Courts of Appeals (including the Eleventh Circuit[2]) used means-end scrutiny as part of their analysis under *Heller*. Under that framework, the government would first justify the regulation at issue by establishing that the challenged law regulated activity falling outside the original scope of the Second Amendment based on its historical meaning. *Bruen*, 142 S. Ct. at 2126. If the historical evidence at that step was inconclusive or suggested that some of the regulated conduct was not categorically unprotected, then the courts would apply "means-end scrutiny"—that is either strict or intermediate scrutiny depending on the case—to determine whether the regulation violated the Second Amendment. *Id.* at 2126-27.

In *Bruen*, however, the Supreme Court explicitly rejected the means-end scrutiny step as "one step too many." 142 S. Ct. at 2127. Instead, the Court set out the following test for assessing the constitutionality of firearms regulations:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

---

[2] *See, e.g., GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1261 at n.34 (11th Cir. 2012) ("Like our sister circuits, we believe a two-step inquiry is appropriate . . . .").

*Bruen*, 142 S. Ct. at 2129-30 (citation omitted).  Under this test, a court must first consider whether the law at issue regulates conduct protected by the plain text of the Second Amendment.  If not, then the Second Amendment is not implicated and the statute survives Second Amendment scrutiny.  But if the prohibited conduct falls within the scope of the Second Amendment, the court must then determine whether the statue is "consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131.  "This historical inquiry can take one of two forms:  (1) a straightforward review of whether such regulations existed at the time of the Nation's founding, or (2) reasoning through analogy that a historical regulation is a proper analogue for a modern firearm regulation." *United States v. Donahue*, ___ F. Supp. 3d ___, No. 2:22-CR-00128-1, 2023 WL 4372706, at *3 (S.D. Tex. July 5, 2023) (citing *Bruen*, 142 S. Ct. at 2131).

With these principles in mind, the Court addresses the parties' arguments.

**B.     Whether *White* Forecloses Defendant's Second Amendment Challenge**

The government first argues there is no need for the Court to even consider the constitutionality of § 922(g)(9) under *Bruen*, since the Eleventh Circuit's decision in *White* "requires the Court to uphold Section 922(g)(9) as presumptively lawful."  [Doc. 32 at 1.]  According to the government, *Bruen* did not overrule or abrogate *White* (1) because the Eleventh Circuit did not apply means-ends scrutiny,

5

which *Bruen* explicitly held to be improper, and (2) because *Bruen* did not disturb *Heller*'s discussion that longstanding firearms prohibitions remain presumptively lawful.  [*Id.* at 6-7.]  In response, Defendant argues that *White* is no longer good law because *Bruen* calls for a far more nuanced historical analysis than *Heller* required, but certainly more than what the *White* court conducted.  [Doc. 34 at 6-7.]  As Defendant sees it, the analysis that *White* relied on is no longer valid, and thus, the Court may no longer rely on its holding to conclude that § 922(g)(9) passes constitutional muster.  [*Id.*]

In the undersigned's view, the government has the better of the arguments. It is black letter law that this Court must follow a binding Eleventh Circuit decision "unless and until the first panel's holding is overruled by the Court sitting en banc or by the Supreme Court." *Stanley v. City of Sanford, Fla*., __ F.4th __, 2023 WL 6614448, at *2 (11th Cir. Oct. 11, 2023) (quoting *Scott v. United States*, 890 F.3d 1239, 1257 (11th Cir. 2018)).  Demonstrating that a published circuit court decision is no longer precedential is a tall order:  "any later en banc or Supreme Court decisions must 'actually abrogate or directly conflict with, as opposed to merely weaken, the holding of the prior panel.'"  *Id.* (quoting *United States v. Kaley*, 579 F.3d 1246, 1255 (11th Cir. 2009)); *see also Edwards v. U.S. Att'y Gen.*, 56 F.4th 951, 965 (11th Cir. 2022) ("For a Supreme Court decision to undermine panel

precedent to the point of abrogation, the decision must be clearly on point and *clearly contrary* to the panel precedent.") (quoting *Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.*, 344 F.3d 1288, 1292 (11th Cir. 2003)) (quotation marks omitted); *Main Drug, Inc. v. Aetna U.S. Healthcare, Inc.*, 475 F.3d 1228, 1230 (11th Cir. 2007) ("Obedience to a Supreme Court decision is one thing, extrapolating from its implications a holding on an issue that was not before that Court in order to upend settled circuit law is another thing.").

Obviously, the central holding of *Bruen*—in which the Court eschewed means-end scrutiny for solely a historical analysis—has no bearing on whether *White* remains good law, since the Eleventh Circuit in *White* did not engage in means-end scrutiny to reach its decision. Instead, as outlined above, *White* analogized § 922(g)(9) to "'longstanding' felon-in-possession laws." *White*, 593 F.3d at 1205. Thus, *Bruen*'s repudiation of using means-end scrutiny does not call the precedential value of *White* into question. The issue, then, is whether *Bruen*'s discussion of how lower courts should evaluate a regulation in light the Second Amendment's text and historical understanding abrogates the reasoning in *White*. The Court thinks not.

Significantly, the type of firearm regulation at issue here is different than the one in *Bruen*. *Bruen* dealt with a state licensing scheme for carrying handguns that

affected the rights of what the Supreme Court termed "ordinary, law-abiding citizens" to possess a firearm. *See Bruen*, 142 S. Ct. at 2122. In contrast, § 922(g)(9) does not affect "ordinary, law-abiding citizens," but rather individuals who have been convicted of serious criminal offenses. Indeed, in reaching its holding in *White*, the Eleventh Circuit observed that a "misdemeanor crime of [domestic] violence," as that term is used in § 922(g)(a), is defined by the "use of force" and violence, *see* 593 F.3d at 1204 (citing 18 U.S.C. § 921(a)(33)(A) and *United States v. Hayes*, 555 U.S. 415 (2009)).

This distinction matters. In fact, this very distinction was determinative in *United States v. Williams*, where U.S. District Judge Leigh Martin May held that *United States v. Rozier*, 598 F.3d 768 (11th Cir. 2010)—an Eleventh Circuit opinion that applied *Heller* to uphold the constitutionality of the felon-in-possession statute, 18 U.S.C. § 922(g)(1)—was still good law. *See* No. 1:21-cr-362-LMM-LTW-1, 2022 WL 17852517, at *2 (N.D. Ga. Dec. 22, 2022). As Judge May explained, "[a]t issue in *Bruen* were the Second Amendment rights of 'law-abiding citizens.' It is axiomatic that a felon is not a law-abiding citizen. Thus, the *Bruen* decision is not 'clearly on point.'" *Williams*, 2022 WL 17852517, at *2. Judge May recently reiterated this holding in *United States v. Childs*, and explained

8

further why a law that affects so-called "law-abiding citizens" differs from one that

disarms persons actually convicted of a crime:

> *Bruen* is not "clearly on point" with and "clearly contrary" to *Rozier*.
> At issue in *Bruen* were the Second Amendment rights of "law-
> abiding citizens." *Bruen*, 142 S. Ct. at 2125, 2134, 2156. It is
> axiomatic that a felon is not a law-abiding citizen. This point was
> underscored by the concurring opinion of Justice Kavanaugh, joined
> by Chief Justice Roberts, in which they noted that "the Second
> Amendment is not a "regulatory blank check" and that "[p]roperly
> interpreted, the Second Amendment allows a 'variety' of gun
> regulations," among them, "longstanding prohibitions on the
> possession of firearms by felons." *Id*. at 2162 (Kavanaugh, J.,
> concurring, joined by Roberts, C.J.). Because the votes of Chief
> Justice Roberts and Justice Kavanaugh were necessary to form the
> *Bruen* majority, their concurring opinion narrows the holding. *See*
> *United States v. Robison*, 505 F.3d 1208, 1221 (11th Cir. 2007)
> (holding that where a fragmented Supreme Court decides a case "and
> no single rationale explaining the result enjoys the assent of five
> Justices," the position based on the "narrowest grounds" or "'less far-
> reaching' common ground" controls). Thus, the *Bruen* decision is
> not clearly on point or clearly contrary to *Rozier*.

No. 1:22-CR-00327-LMM-LTW-1, 2023 WL 6845830, at *2-3 (N.D. Ga. Oct. 16,

2023) (footnote omitted); *accord United States v. Kirby*, No. 3:22-CR-26-TJC-

LLL, 2023 WL 1781685, at *2-3 (M.D. Fla. Feb. 6, 2023) (holding that *Bruen* did

not abrogate *Rozier*). Because *Rozier* and *White* used the same reasoning to reach

their results, this Court must continue to apply *White* unless and until the Eleventh

Circuit or Supreme Court say otherwise.

And were that not enough, it appears that in *White*, the Eleventh Circuit engaged in the sort of reasoning-by-analogy that *Bruen* directed courts to use when evaluating a modern regulation (or at least something very close to it). Specifically, the Eleventh Circuit started with the premise, as set out in *Heller*, that "nothing . . . should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Heller*, 554 U.S. at 626. Having thus established a deeply-rooted historical tradition—namely, that states have historically and appropriately restricted the possession of firearms by felons—the Court then analogized felons to domestic abuse misdemeanants and explained that § 922(g)(9) simply closed a loophole[3] by ensuring that a person who acted violently toward family member or committed spousal violence could not lawfully possess a firearm. In doing so, the Eleventh Circuit underscored that § 922(g)(9) was, by definition, focused on violence, or at least the threat of violence, and that this aspect of § 922(g)(9) made it analogous to other, presumptively valid "'longstanding' felon-in-possession laws," on which the Supreme Court in *Heller* did not "cast doubt." *White*, 593 F.3d at 1206 (citing *In re United States*, 578 F.3d 1195 (10th Cir. 2009)).

---

[3] Namely, that domestic abusers, who "have first acted violently towards a family member," are often not charged with or convicted of felonies. *White*, 593 F.3d at 1205-06.

10

In short, the Eleventh Circuit read *Heller* to acknowledge that the prohibition on felons possessing firearms is deeply rooted in this nation's history because felons can pose a danger to others, and, following *Heller*, extended that reasoning to domestic abuse misdemeanants using historical analogy. This does not directly conflict with *Bruen* and, thus, *White* remains good law. As a result, *White* dictates that Defendant's motion to dismiss should be denied.

**C.    Whether § 922(g)(9) is Constitutional Under *Bruen***

Even if *White* were no longer controlling, the Court concludes that § 922(g)(9) would remain constitutional under *Bruen.* As discussed above, the *Bruen* test is two-fold: the Court starts by asking if the prohibited conduct falls within the scope of the Second Amendment, and if so, it then determines whether the statue at issue is "consistent with the Second Amendment's text and historical understanding." *See Bruen*, 142 S. Ct. at 2131.

Defendant first argues that the Second Amendment covers his conduct because possessing a firearm falls under the Amendment's protection of the right to keep and bear arms. [Doc. 30 at 2-4.] The government does not challenge this point. In view of the government's silence on this issue, the Court will assume

without deciding that Defendant satisfies the threshold showing under *Bruen*.[4] *United States v. Bruner*, No. CR-22-518-SLP, 2023 WL 2653392, at *2 (W.D. Okla. Mar. 27, 2023) (assuming without deciding that the plain text of the Second Amendment covered defendant's conduct charged under § 922(g)(9) where the government did not address the issue).

The Court turns next to the second prong of the *Bruen* analysis—that is, whether the government can show that § 922(g)(9) is supported by the historical tradition of firearm regulation in this country.  In attempting to meet this burden, the government relies on the "analogical" historical inquiry because, as it concedes,

---

[4] This threshold issue has divided courts.  *Compare United States v. Bernard*, No. 22-CR-03 CJW-MAR, 2022 WL 17416681, at *7 (N.D. Iowa Dec. 5, 2022) (concluding that, "as a textual matter, the plain reading of the Second Amendment covers defendant who is a person under the Constitution") and *United States v. Jackson*, 622 F. Supp. 3d 1063, 1066 (W.D. Okla. 2022) (declining "to read into *Bruen* a qualification that Second Amendment rights belong only to individuals who have not violated any laws), *with United States v. Porter*, Crim. A. No. 22-00277, 2023 WL 2527878, at *2 (W.D. La. Mar. 14, 2023) ("[T]his Court is of the opinion that [defendant], as someone who was convicted of domestic abuse battery and thus who is not 'law abiding,' is not facially protected by the Second Amendment.").  But because the government does not even begin to challenge Defendant's contention that § 922(g)(9) implicates the Second Amendment's right to bear arms, this Court may assume without deciding "that convicted misdemeanants likely fall within 'the people' contemplated by the Second Amendment and retain their right to bear arms to an extent" and proceed to the second prong of the *Bruen* analysis.  *See, e.g., United States v. Hughes*, No. 2:22-cr-640-DCN-1, 2023 WL 4205226, at *8 (D.S.C. June 27, 2023) (assuming without deciding that the Second Amendment covers § 922(g)(9)).

the founders "were not preoccupied with the same concerns regarding domestic violence that led to the enactment of Section 922(g)(9) in modern times." [Doc. 32 at 9.] The government argues that historically, the state disarmed groups of individuals that were perceived to pose a danger to society—that is, those who "threatened violence and the risk of public injury—and urges that § 922(g)(9) is relevantly similar to this tradition of disarming dangerous people. [*Id.* at 10-11.] Defendant counters, however, that "the government and many of the cases [it cites] omit actual historical context." [Doc. 34 at 5.] According to Defendant, there simply is no historical analogue to disarming individuals convicted of domestic violence. [*Id.* at 2-5.]

*Bruen* explains that "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" 142 S. Ct. at 2132. The Supreme Court identified "two metrics" to use when engaging in an analogical inquiry: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. Reiterating *Heller*, the Court emphasized that "individual self-defense is the *central* component of the Second Amendment right." *Id.* at 2133 (quoting *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 767 (2010)) (internal quotation marks omitted). Because of this, "whether modern and

13

historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are *central* considerations when engaging in an analogical inquiry." *Id.* (citations and quotation marks omitted).

Since *Bruen* came down, every court to address the issue has concluded that § 922(g)(9) is "relevantly similar" to the historical tradition of prohibiting dangerous individuals—including felons—from possessing firearms. In particular, the undersigned finds persuasive the following well-reasoned decision in *United States v. Donahue*, which addressed both metrics discussed above:

> Here, an analogy can be drawn between Section 922(g)(9) and founding-era legislation that disarmed people who were deemed dangerous. The prohibition of possession of firearms by domestic violence misdemeanants, and other groups identified as dangerous, is supported by history. *See, e.g.*, Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 Wash. U. L. Rev. 1187, 1239 (2015) ("[H]istory suggests that when the legislature restricts the possession of firearms by discrete classes of individuals reasonably regarded as posing an elevated risk for firearms violence, prophylactic regulations of this character should be sustained."); Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit,* 60 Hastings L.J. 1371, 1377 (2009) (citing historical examples for the proposition that "any person viewed as potentially dangerous could be disarmed by the government without running afoul of the 'right to bear arms.'").

> The historical record reflects significant regulation of firearms designed to ensure public safety and responsible gun ownership. In the founding era, firearms "could be required to be registered," gun

14

owners could be required to undergo training, and the law could mandate storage requirements for "firearms and gun powder." *United States v. Nutter*, 624 F.Supp.3d 636, 641 (S.D. W. Va. 2022) (citing Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1562-63 (2009)).  Finally, founding era laws prohibited bearing arms in a way that spread "fear" or "terror" among the people. *Bruen*, 597 U.S. at __, 142 S.Ct. at 2145.  "In sum, founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." *Nutter*, 624 F. Supp. 3d at 643 (citing *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019), abrogated by *Bruen*, 142 S.Ct. 2111 (Barrett, J., dissenting)).  When Section 922(g)(9) was enacted, Congress deemed those convicted of domestic violence as dangerous, and "that conclusion is well supported by empirical evidence and statistics regarding domestic violence, recidivism by those convicted of misdemeanor crimes of domestic violence, and increased risks of serious harm and death posed when firearms are present in connection with domestic violence." *Id*. (citing *United States v. Staten*, 666 F.3d 154, 161-67 (4th Cir. 2011)).  Therefore, through analogy, Section 922(g)(9) is consistent with the Nation's historical tradition of firearm regulation.

*Donahue*, 2023 WL 4372706 at *3.

As mentioned, *Donahue* is in good company.  Indeed, the Court's own research reveals that ***every*** court to consider this issue has reached the same conclusion.  *See, e.g., United States v. DeLauder*, No. 2:23CR08, 2023 WL 5658924, at *2-3 (N.D.W. Va. Aug. 31, 2023); *United States v. Proctor*, No. 2:23-CR-00074, 2023 WL 4710883, at *2 (S.D.W. Va. July 24, 2023); *Hughe*s, 2023 WL 4205226, at *12; *United States v. Ryno*, __ F. Supp. 3d __, No. 3:22-CR-00045-JMK, 2023 WL 3736420, at *16 (D. Alaska May 31, 2023), *report and recommendation adopted, id.* at *6-7; *United States v. Padgett*, No.

321CR00107TMBKFR, 2023 WL 2986935, at *10-11 (D. Alaska Apr. 18, 2023); *Bruner*, 2023 WL 2653392, at *2; *Porter*, 2023 WL 2527878, at *4; *United States v. Gleaves*, __ F. Supp. 3d __, No. 3:22-CR-00014, 2023 WL 1791866, at *4 (M.D. Tenn. Feb. 6, 2023); *Bernard*, 2022 WL 17416681, at *8; *United States v. Anderson*, No. 2:21-CR-00013, 2022 WL 10208253, at *1 (W.D. Va. Oct. 17, 2022); *United States v. Nutter*, 624 F. Supp. 3d 636, 643-44 (S.D.W. Va. 2022); *Jackson*, 622 F. Supp. 3d at 1067.

Defendant urges this Court to decide against this weight of authority because, in his view, there is no historical evidence to support disarming domestic abusers. In particular, he contends that while domestic violence has been a problem since the founding of this country, the government did not intervene to disarm persons convicted of domestic violence until very recently. [Doc. 34 at 2-3.] He also contends that disarming people because they are vaguely considered "dangerous" to the state is not analogous to prohibiting convicted misdemeanants for domestic abuse, for which there is simply no tradition. [*Id.* at 4-5.] For support, he relies on *United States v. Rahimi*, 61 F.4th 443 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023), and *United States v. Perez-Gallan*, 640 F. Supp. 3d 697 (W.D. Tex. 2022), *aff'd*, 2023 WL 4932111 (5th Cir. Aug. 2, 2023).

Defendant's arguments and citation to Fifth Circuit authority are not persuasive. *Bruen* instructs courts to consider both the "comparable burden" and "comparable justification" of a firearm regulation when looking to see if a modern law is "relevantly similar" under the Second Amendment. *Bruen*, 142 S. Ct. at 2123-33. But this "analogical reasoning . . . is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 2133. While "courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted,'" they must also bear in mind that "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021)). Thus, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

Here, the Court finds that the government has satisfied its burden to "identify a well-established and representative historical analogue" to disarming domestic abuse misdemeanants—namely, the historical treatment of dangerous persons and felons. The "comparable burden" on the right to self-defense imposed by § 922(g)(9) passes constitutional muster because, as the government points out, § 922(g)(9) is even less burdensome that some historical analogues because it

17

applies only to **people who have been convicted of a violent crime** against a family member or intimate partner in a court of law, and, thus, have received due process. *See* 18 U.S.C. § 921(a)(33)(B)(i).  And, as the government points out, an individual can cease to be a prohibited person through pardon, expungement, or restoration of civil rights.  *See* 18 U.S.C. § 921(a)(33)(B)(ii).  As for the "comparable justification," the government has satisfied that showing by pointing to the historical practice of disarming dangerous and violent individuals.  [Doc. 32 at 12.]

Meanwhile, the two cases that Defendant cites—*Rahimi* and *Perez-Gallan*—both address the constitutionality of a completely different offense, 18 U.S.C. § 922(g)(8), which prohibits firearm possession by those subject to a restraining order related to domestic violence.  On this point, the undersigned again finds *Donahue*'s reasoning instructive.  There, the court explained that § 922(g)(8) is not an appropriate analogue because (1) it "disarms individuals after a civil proceeding, whereas Section 922(g)(9) does so after a criminal proceeding"; (2) it "disarms people based on a finding of a credible threat, whereas Section 922(g)(9) disarms by class or group—*i.e.*, those convicted of a misdemeanor crime of domestic violence";  and (3) it "disarms an individual for the protection of an identified person from the threat of domestic gun abuse, whereas Section 922(g)(9) disarms a class or group of people to maintain political and social order."  *Donahue*, 2023

18

WL 4372706, at *4 (quotations and citations omitted).  *Donahue*'s reasoning is sound.  Accordingly, this Court declines to apply *Rahimi* or *Perez-Gallan* to § 922(g)(9) by analogy.

In sum, the Court follows the lead of every Court to address the issue and finds that the government has met its burden to demonstrate that § 922(g)(9) is consistent with the historical tradition of firearm regulation in this nation. Accordingly, even if *White* were no longer binding, § 922(g)(9) remains constitutional under *Bruen.*

## III.   CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Defendant's Motion to Dismiss Indictment [Doc. 12] be **DENIED**.

The Court has now ruled on all of this Defendant's pretrial motions.  As a result, this case is **CERTIFIED READY FOR TRIAL**.

SO RECOMMENDED this 20th day of October, 2023.

_____
JOHN K. LARKINS III
United States Magistrate Judge

19